**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**William Gary CUTTING,
Defendant-Appellee.**

**Nos. 76–1898, 76–2016 to 76–2018.**

United States Court of Appeals,
Seventh Circuit.

Heard Jan. 17, 1977.

Decided April 4, 1977.[*]

Rehearing Denied May 3, 1977.

---

\* This appeal was originally decided by unreported order on April 4, 1977. See Circuit Rule 35.

The Court has subsequently decided to issue the decision as an opinion.

David C. Mebane, U.S. Atty., Grant C. Johnson, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellant.

Dennis P. Coffey, Milwaukee, Wis., for defendant-appellee.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CUMMINGS, Circuit Judge.

The defendant, William Gary Cutting, and then co-defendant, Jerome Lawrence Masko,[1] were indicted on February 20, 1976, for armed bank robbery of the Poplar Branch of the National Bank of Commerce of Superior, Wisconsin, in violation of 18 U.S.C. § 2113(a). This indictment was superseded on May 27, 1976, by a subsequent indictment returned against the defendants charging each with one count of conspiracy to commit five armed bank robberies, four substantive counts of armed bank robbery, and one count for aiding and abetting the armed bank robbery of the Poplar Bank on January 29, 1976, in violation of 18 U.S.C. §§ 2113(a) and (d).

After the superseding indictment was filed, Cutting moved to suppress certain blocks of evidence. In response to these motions, suppression hearings were held on August 13, 1976, September 15, 1976, and September 23, 1976. The sequence of events leading to the gathering of inculpatory evidence against Cutting began with his warrantless arrest on January 29, 1976. In a search incident to that arrest, a motel room key was found in his pocket. On the same day, a search warrant was issued for the motel room. The next day a search warrant was issued for a Ford Gran Torino car based on fruits of the motel room search. Later that day, the Ford pickup truck Cutting was driving when arrested was searched pursuant to a warrant. Appeal No. 76–1898, filed September 10, 1976, is from the trial court's order of August 13, 1976, holding the arrest to have been unlawful. On October 14, 1976, appeal No. 76–2016 was filed from Judge Doyle's September 15, 1976, order that the search of the motel room was illegal as the fruit of an unlawful arrest. On the same day, appeal No. 76–2017 was taken from the trial court's September 23, 1976, order holding illegal the search of the Ford Gran Torino. Finally, on October 15, 1976, appeal No. 76–2018 was taken from Judge Doyle's written order of October 14, 1976, suppressing evidence found in the search of the Ford truck as well as any testimony of law enforcement officials concerning observations of the truck after it was stopped on January 29, 1976, in order to effectuate Cutting's arrest. Pursuant to orders of October 8 and October 20, the four appeals were consolidated for purposes of briefing and oral argument.

The cornerstone of the district judge's suppression orders is his conclusion that the January 29, 1976, arrest was unlawful. If the arrest was lawful, the other issues raised before us—the point in time when the arrest occurred and the scope of the search permissible in an armed stop—evaporate. Because we find the January 29,

---

1. Masko pled guilty to the charges in the indictment on August 9, 1976, and since has been sentenced. His plea agreement obligates him to testify against Cutting.

1976, arrest to have been lawful and evidence suppressed in 76–2016, 76–2017 and 76–2018 therefore to be the fruits of a lawful arrest, we reverse and remand for further proceedings.[2]

*Legal Principles and Standard of Review*

A warrantless arrest can only be sustained if the arresting officer has probable cause to believe that a crime has been or is being committed by the suspect. *Beck v. Ohio*, 379 U.S. 89, 91, 96, 85 S.Ct. 223, 13 L.Ed.2d 142. And a search incident to a warrantless arrest is only sustainable if probable cause exists for the arrest. *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134. But if probable cause exists so that the arrest is lawful, a full search of the person is permitted. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427. Thus the motel key and all derivative evidentiary fruits may not be suppressed here under a "fruit of the poisonous tree" theory if the arresting officer had probable cause to arrest Cutting.

A "probable cause" analysis requires an assessment of the information available to the arresting officers at the time of arrest and a judgmental determination—"whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142; *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1379. Yet it also must be kept in mind that "[e]vidence required to establish guilt is not necessary." *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134. The line between "mere suspicion and probable cause * * * necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstanc-

es." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1379. And in this accounting, regard must be given to the "gestalt which a factual situation presents." *United States v. Rubio,* 404 F.2d 678, 681 (7th Cir. 1968).

Before we turn to the task of measuring the facts of this case against these principles, we must make an initial judgment on what our standard of review of the district court's order should be. Here, unlike the situation in *Beck v. Ohio*, 379 U.S. 89, 92–93, 85 S.Ct. 223, 13 L.Ed.2d 142, the trial judge entered extensive findings of fact in coming to his conclusion that probable cause did not exist. Yet while we may not sit as a *nisi prius* fact-finder, we are permitted to review the trial court's factual findings and that portion of the record not in conflict therewith in order to assess intelligently the correctness of the trial court's legal conclusion whether or not probable cause exists. *Ker v. California,* 374 U.S. 23, 34, 83 S.Ct. 1623, 10 L.Ed.2d 726; *Linn v. Garcia,* 531 F.2d 855, 861 (8th Cir. 1976).

*The Facts Surrounding the Arrest*

Because we must accept the findings of the trial court on disputed matters and since the Government accepts the trial court's factual findings, we set forth *verbatim* Judge Doyle's factual findings and review his probable cause determination on these findings as occasionally supplemented by noncontradictory record amplification.

At the conclusion of the August 13, 1976, hearing, Judge Doyle found orally as follows (Tr. 220–227):

"The defendant, Cutting, was arrested in Douglas County at the intersection of Highway 53 and Highway M at about 11:07 a. m. on January 29, 1976. The arrest was made by Michael Potthier, a traffic Lieutenant in the Sheriff's Department of Douglas County; and the arrest occurred at the point at which Mr. Potthier handcuffed the defend-

---

**2.** Since the evidence in 76–2016, 76–2017 and 76–2018 was apparently suppressed only on a fruit of an unlawful arrest theory, the other theories advanced in defendant's motions to suppress are not before us. (Trial court's order of September 10, 1976, at 1–2.) They are for the district court's resolution on remand.

ant after patting him down. And on the basis of the present record, I will find that the status of the defendant as a person under arrest was continuous from the time that the handcuffs were placed on him by Lieutenant Potthier until the end of the sequence as to which testimony was received today, that is, sometime in which other officers then appeared on the scene and joined in the activities there.

"The arrest was made without the existence of a warrant issued by a neutral and detached magistrate or by anyone. At the time of the arrest, no one associated with Lieutenant Potthier in the investigation in progress concerning the bank robbery, or anyone associated with him in the effort to locate and stop the Ford truck, possessed any significant information beyond that which Lieutenant Potthier himself possessed when he made the arrest.

"At the time that the arrest was made, Lieutenant Potthier had the following information bearing on the question of probable cause: he had been informed that a robbery had occurred at the Poplar Bank at about 9:31 a. m. or slightly prior thereto, a matter of minutes thereto; and that the robbery had been performed by two persons, two males, one of whom was wearing a ski mask and another who had a heavy beard; and that the two bank robbers had departed from the bank following the robbery in a certain Oldsmobile car with a certain description and certain license number, all as reflected in the record of this hearing; and that at some time between the time of the getaway from the bank and about 10:07, the Oldsmobile used for the getaway was parked near the intersection of Bayfield and Lackson Roads approximately two-and-a-half miles west of the Poplar Bank, generally west of the Poplar Bank.

"He had been informed that at about 9:45 a. m. Mr. Renman, driving east on Bayfield Road, at a point approximately 225 yards west of the intersection of Bayfield and Lackson Roads, had come upon a certain blue Ford pickup truck described as the description appears in this record in Mr. Renman's testimony including the license number of that Ford truck. And Mr. Potthier was informed that as Mr. Renman approached that truck on Bayfield Road, it was stuck in the snow on the north side of the road, unable to get out of the ditch on its own power, and that the defendant, Cutting, was standing at the truck and waived [sic] Renman down and asked Renman for his assistance in getting out of the ditch.

"Potthier knew that the approximate distance between the point at which the Ford truck was stuck and the point at which the Oldsmobile was then parked was approximately 275 yards, that is, that the Oldsmobile was about 50 yards beyond the intersection of Bayfield and Lackson Roads.

"Potthier knew that Renman was driving a school bus at the time that he came upon the defendant and the Ford truck and that Renman had pulled the truck out of the ditch with the use of a bus and a chain; and that Renman characterized the manner and appearance of the defendant as very nervous.

"Potthier had been told by Renman that at the beginning of Renman's encounter with the defendant, the defendant had been okay, meaning pleasant and natural; but that at some point during the process of arranging to pull the truck out of the ditch and pulling it out of the ditch, at some point during that sequence the defendant had snapped at Renman verbally and that Renman had considered this verbal conduct on the defendant's part to be out of line or inappropriate to the circumstances.

"Renman told Potthier in the same conversation to which I have referred, which lasted approximately two to three minutes, that in Renman's opinion the parties who had been in the Oldsmobile were now in the Ford truck; and Renman told Potthier that one party had been near the Oldsmobile at a certain time that morning and had gone south on Lackson Road.

"At that point, approximately twenty-five yards east of the point at which the truck had been stuck, Potthier observed tracks in the snow leading from the north edge of Bayfield Road into a woods nearby

to the north, and tracks leading from a point in those woods south to the north edge of Bayfield Road; and he observed from the markings that the person who had made the tracks appeared to have stopped at a certain point in the woods and also that along the course of the track of the footprints and at the point where the person had stopped, there was evidence that some heavy object which Potthier reasonably inferred might be a heavy bag, had been set down upon the snow or pulled along at times in the snow.

"Potthier knew, by reason of statements made to him by Renman, that after Renman had pulled the truck out of the ditch with the use of the bus, the truck had proceeded in an easterly direction on Bayfield Road; and Potthier knew that Renman had then proceeded east on Bayfield Road to the intersection with Lackson Road and that Renman had then stopped his bus, had gotten out of it, had gone over to the vicinity of the Oldsmobile car and had returned to the intersection when the Ford truck returned to the scene, stopped at a distance of I believe about 25 to 50 yards from the intersection, that the defendant had got out of the truck, had run to the intersection where Renman was, had asked Renman what he was doing, that Renman had made some excuse to the effect that Renman was considering whether he could help someone else who was in trouble along the road, and that the defendant had then departed back to the Ford truck and that the truck had then departed the scene headed West on Bayfield Road, and that as the truck was departing from the scene at this state, Renman had seen in the back of the truck the heads or the top portions of the bodies of two persons other than the defendant, Cutting.

"The description of the Ford truck, as given to Potthier by Renman at the time of the conversation I have just been referring to included the information that the truck had several aerials in addition to the aerial commonly found on civilian vehicles—Excuse me.

"Renman had told Potthier that there were four aerials on the truck. At the time of the arrest Potthier knew, by what he heard over his squad car radio, that the Ford truck was following and had followed a route that corresponds basically to the route shown on Government's Exhibit 2; and Potthier knew that at least one intervening effort to intercept the Ford truck to restrain its movement had failed because the truck had not appeared at the place at which it had been expected to appear as a result of various sightings, from which Potthier inferred and was entitled to infer that it was possible that the truck was equipped with radio equipment that would permit the driver of the truck to hear what communications were passing among the law enforcement officers.

"I would like to insert a word of explanation in these findings with respect to some of the findings that I have made bearing on the conversation between Potthier and Renman, that I consider the witness Renman to be a generally reliable witness with no ax to grind; but that I have accepted the testimony of Potthier rather than Renman as to what was said to Potthier by Renman and that my reasons for that distinction are, first, that Potthier is experienced and trained in law enforcement and could be expected to recall reasonably clearly significant information that was conveyed to him by Renman at the time; and I am influenced in this respect by Potthier's testimony to the effect that the entire conversation with Renman took about two or three minutes. And I am influenced by Renman's testimony to the effect that when he called into the Sheriff's office and spoke to the dispatcher, he had a sense of impatience with the dispatcher's questions because Renman considered that the big idea was to get going and to catch the people in the truck; all of which leads me to believe that the conversation between Renman and Potthier did not include certain details concerning what had happened when Renman stopped to pull the truck out of the ditch.

"I find that Renman did not see anyone leave the Oldsmobile car and enter the Ford

truck, nor did he see anyone other than a certain Mr. Mattson, whom he knew as a resident of the area, in the vicinity of the stalled truck and the Oldsmobile other than the defendant and other than the two additional persons whom he saw in the back of the truck when last he saw the truck as it departed from the scene.

"I have made certain findings as to what information Potthier had at the time he made the arrest. To the extent that that information included information about the presence of someone in the vicinity of the Oldsmobile and moving south on Lackson Road, or to the extent that that information included any expressions of opinion or belief on Renman's part is understood by Potthier that people in the Oldsmobile had left the Oldsmobile and entered the Ford truck, I must disregard any information apparently based on Renman's observations in this respect as inaccurate and incorrect. And then I must disregard any information as to what Mattson may have told Renman because there was no basis for evaluating the reliability of those statements by Mattson to Renman.

"Oh, I should add, though, that at the time that Potthier was present at the intersection of Bayfield and Lackson Roads, shortly prior thereto he had been informed by Mattson that the Oldsmobile was abandoned at about the intersection of Bayfield and Lackson Roads.

"I consider that I must evaluate all this as if the information that I have just summarized had been presented to a neutral and detached magistrate immediately prior to the arrest and as if that magistrate had then been called upon to determine whether this information established probable cause to believe that the defendant, Cutting, had participated in some way in the bank robbery.

"I conclude that this information does not establish probable cause to believe that the defendant had participated in the bank robbery, that it added up to information that would justify a considerable degree of suspicion probably sufficient to justify the stopping of the truck and the making of inquiries of the driver, but that it did not add up to that degree to what constitutes probable cause for the purpose of a warrantless. arrest; and I will order that all evidence which can reasonably be attributed to the warrantless arrest, that is, all evidence the gather of which was a result of the warrantless arrest, is to be suppressed."

On August 20, 1976, Judge Doyle issued written findings that amplified his earlier findings concerning the Oldsmobile and the Ford pickup truck. Judge Doyle found as follows:

"It is obviously important to determine what information Potthier had at the time of the warrantless arrest to support the theory that the participants in the bank robbery who used the Oldsmobile automobile for the getaway then used the blue Ford pickup truck for further transportation. In this connection, information about the movement of persons or things from the Oldsmobile to the Ford truck was of critical importance, and there was some uncertainty in the testimony of Potthier and Renman as to what Renman had said to Potthier on this subject.

"In comments from the bench on August 13, 1976, I made a statement to the effect that where the testimony of Potthier and Renman was inconsistent as to their conversation on January 29, 1976, I would accept Potthier's version.

"On the specific point of movement of persons or things between the Oldsmobile and the Ford truck, Renman testified unequivocally that he had seen none, and I find as fact that he saw none. I also find as fact that Renman did not tell Potthier that Renman had seen any movement of persons or things between the Oldsmobile and the Ford truck.

"I find that Renman did tell Potthier that Matson [sic] had told Renman that Matson [sic] had seen a person in the vicinity of the Oldsmobile walking southerly on Laxon (phonetic?) road from the intersection of Bayfield and Laxon roads. With respect to this bit of information, I

hold that it may not be used to establish the existence of probable cause for the reason that Potthier had no basis for evaluating the reliability of Matson [sic] as a witness."

Of course, the crucial inquiry here is whether there is a sufficient nexus linking the Oldsmobile used in the robbery and Cutting's pickup truck. To begin with, we do not agree that Mattson's account of a person in the vicinity of the Oldsmobile must be discounted on the grounds that Officer Potthier had no basis for evaluating his reliability.[3] Although Renman did not know Mattson personally, Renman knew Mattson by face and knew where his residence was (Tr. 63). Renman was known by Officer Potthier to be a school-bus driver, a position of some responsibility. While Renman was engaged in towing the truck out of the soft road shoulder area, Mattson reappeared in his truck and watched the towing operation (Tr. 69). After the truck was pulled out and started on its way, Renman stopped near the intersection to inspect the Oldsmobile. Mattson followed Renman and both got out of their vehicles at the intersection. Renman told Mattson that the bank had been robbed, that the Oldsmobile was the getaway car, and that Renman suspected the driver of the pickup truck as being involved (Tr. 75). Mattson told Renman that he had tried to pull the truck out ahead of Renman and, having failed, left to get some traction mats and returned to see Renman attempting to tow the pickup truck with his bus (Tr. 75, 92, 93). In fact, Renman had seen evidence of a prior attempt to tow the truck in his towing efforts (Tr. 75). In sum, we conclude that Renman had a sufficient basis for relying on the veracity of Mattson's statement to Renman that he had seen an apparent companion of the truck driver's walking around in the vicinity of the car prior to Renman's arrival[4] (Tr. 75, 97).

At this level of analysis, we have information by Mattson, a justifiably reliable source in Renman's eyes, as told to Renman, a justifiably reliable source in Potthier's eyes, conveyed to Potthier. We do not have to decide if sufficient incidents of trustworthiness adhere to Mattson's hearsay information about a man walking near the car to justify Officer Potthier's relying on Mattson's information without more. After the truck departed upon Renman's telling the driver that he was helping someone else out while parked near the Oldsmobile, Mattson agreed to contact the police (Tr. 76). Shortly thereafter Mattson stopped upon seeing Potthier's squad car parked alongside the road and told Potthier the location of the abandoned blue Oldsmobile although he did not tell him it was suspected by Renman as having been the one used in the bank robbery (Tr. 133, 162).[5] When Potthier reached the car (see note 4 *supra*), Renman was there and told Potthier that he had sent Mattson to contact the police. Therefore, we hold that the district judge's legal conclusion that Potthier had no basis for

---

**3.** Renman's account of Mattson's statement was as follows:

"Well, he [Mattson] told me [Renman] that someone else had been standing around by the car while he was trying to pull him out.

＊　　＊　　＊　　＊　　＊　　＊

"Well, he told me that this fellow was walking back and forth and he had walked south on Lackson Road ·and he couldn't see˙ him any more because the woods was [sic] in the way. And he [Mattson] said he [Cutting] must have gone down to pick him up." (Tr. 75)

Renman relayed this information to Potthier as follows:

"He [Renman] said the truck pulled—as he pulled out, the truck pulled out, turned south on the Lackson Road and picked up a party

that had been or he believed had picked up this party that had been standing near the car on the highway near the intersection." (Tr. 135)

**4.** Empirical data exists which tends to confirm Mattson's statement. Potthier found footprints leading from the Oldsmobile to the intersection and then proceeding south on Lackson Road just before Renman returned to the scene after having called the police from a nearby farmhouse (Tr. 164).

**5.** It is unclear whether Potthier knew Mattson personally. There is testimony that Potthier knew Mattson was a trapper and had found the tracks into the woods first but the time sequence is totally ambiguous (Tr. 168).

evaluating the reliability of Mattson as a witness was in error.

Apart from Mattson's direct linkage between the pickup truck and the Oldsmobile, various circumstantial evidence provides a nexus between the two vehicles. Potthier knew that the pickup truck had been 275 yards from the getaway car 2½ miles from the bank fifteen minutes after the robbery. Further, the officer had observed footprints in the snow leading into the woods approximately 25 yards from where Cutting's truck had been stuck, and marks in the snow indicating that a heavy object was being pulled through the snow. Potthier also knew that after acting as if he was in a hurry to have Renman pull the truck out of the ditch, Cutting came back after he had gone temporarily out of sight south on Lackson Road and, upon seeing Renman on foot in the immediate (less than 25 yards away) vicinity of the getaway car, drove up and asked Renman what he was doing. After Renman placated Cutting with his story about helping someone else, Cutting drove off at a high rate of speed, spinning his wheels as he took off. Coupled with Mattson's statements, this circumstantial evidence provides a sufficient nexus between the truck and the getaway car to serve as the linchpin for a finding of probable cause.

Since we hold that Potthier had probable cause to arrest Cutting, we find that Cutting's arrest and Potthier's search of Cutting's person incident thereto were lawful. Therefore the orders of the district court are reversed and the case is remanded for further proceedings consistent herewith.