**UNITED STATES of America**

v.

**Donald E. BELLE.**

**Appeal of Donald BELLE.**

**No. 77–1903.**

United States Court of Appeals, Third Circuit.

Submitted Jan. 3, 1978.

Argued En Banc Nov. 6, 1978.

Decided Feb. 8, 1979.

As Amended Feb. 28, 1979.

Victor Sherman, Nasatir, Sherman & Hirsch, Los Angeles, Cal., for appellant Belle.

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Douglas B. Richardson, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Submitted Jan. 3, 1978.

Before ADAMS,* GIBBONS, and GARTH, Circuit Judges.

Argued Nov. 6, 1978 En Banc.

Before SEITZ, Chief Judge, and ALDISERT, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.

* Judge Adams was unable to sit with the Court en banc because of injuries.

OPINION OF THE COURT

GARTH, Circuit Judge.

This is an appeal from a jury verdict finding appellant Donald E. Belle guilty of conspiracy to possess, and possession with intent to distribute, 60 ounces of uncut heroin, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Primarily, Belle contends that the district court in violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), at trial admitted into evidence a statement made by Munford, Belle's codefendant. Belle also charges that the district court, among other errors, improperly denied his motion to suppress certain physical evidence and his post-arrest statements. We hold that the statement of Belle's codefendant, which did not mention or refer to Belle, was properly admitted into evidence and did not transgress the *Bruton* rule. We also conclude that there is no merit in Belle's remaining contentions. We therefore affirm.

I.

On Friday, April 30, 1976, at approximately 3:00 p. m. two agents (Wasyluk and Albright) of the Bureau of Alcohol, Tobacco and Firearms (ATF) were at the Hilton Inn Hotel, Old Lincoln Highway, Trevose, Pennsylvania, to meet with their supervisor on a matter unrelated to the instant case. Trevose is virtually a suburb of Philadelphia and is also within a short distance from Bristol, Pennsylvania.

While awaiting the arrival of their supervisor, Agent Wasyluk observed two individuals, later identified as Belle and Munford, sitting in a late model, white Lincoln Continental Mark IV with California license plate 727–MPH, which was in the parking lot of the hotel. Shortly thereafter, while in the hotel lobby Munford was overheard inquiring about a suite and then was observed registering for a double room. Wasyluk became suspicious of the two men because of the colorful manner in which Munford and Belle were dressed, the California plates on the Lincoln Continental, and the fact that Munford and Belle were registering on a Friday evening at a hotel located in an area with little activity as opposed to the city attractions of downtown Philadelphia.

Their suspicions aroused, the agents checked on the Lincoln's registration and learned that it was registered to Edward Keefe O'Neil, 1811 South Carmona Avenue, Los Angeles, California. With this information, they then called the Drug Enforcement Agency (DEA) in Philadelphia to inquire whether the DEA had any information concerning O'Neil.

DEA Agent Kean with whom the ATF agents spoke was familiar with the name of Edward O'Neil. Kean learned from the DEA files that two reports had been given eighteen and twenty-one months before by an informant familiar with heroin traffic whom Kean considered very reliable. The reports indicated that an Edward O'Neil, of 1811 South *Carolina* Avenue, Los Angeles, was a major drug trafficker who dealt in brown Mexican heroin which he transported cross-country by car, stopping in various cities before reaching Bristol, Pennsylvania, his final stop and home town. According to the report, O'Neil owned a late model *Cadillac,* bearing California plates with a false undercarriage in which he stored the heroin. The report also contained a description of O'Neil which fit either of the occupants of the Lincoln.[1] Because the Lincoln was registered to Edward Keefe O'Neil at an address substantially similar to that in the report and the Lincoln had stopped in Trevose, Agent Kean assigned a team of DEA agents to conduct a surveillance of the Lincoln and its occupants. The ATF agents

---

1. We recognize the differences between the material revealed in the DEA reports and the observations of the agents at the hotel and the information they had garnered, i. e., O'Neil's address, South Carolina Avenue rather than South Carmona Avenue; a difference in license plate number; a difference in car make, a Cadillac rather than a Lincoln; and a difference in the location of the secret compartment built into the automobile. We do not regard these differences as significant in light of the overall circumstances which gave rise to the agents' suspicions.

maintained surveillance until the arrival of the DEA team.

At 7:30 p. m. as Munford and Belle left their room, DEA Agents Kean and Hobson drove their vehicle to the intersection of Old Lincoln Highway and Route 1, parking in the lot of the Krispy Kreme Donut Shop, from which vantage point they could observe the Hilton Inn Hotel and the movement of vehicles in all directions.

With Munford driving and Belle as a passenger, the Lincoln exited onto Old Lincoln Highway heading east toward Route 1, drove into the parking lot of the donut shop and parked in close proximity to the DEA agents. Hobson observed Belle get out of the Lincoln and make a hand signal in the direction of a 1973 silver colored Cadillac which was parked across the street, point back in the direction of the Lincoln, and then reenter the Lincoln. The Lincoln then left the parking lot of the donut shop, and proceeded west on Old Lincoln Highway followed by the Cadillac which had license plates indicating that the vehicle was owned or driven by a handicapped person.

Kean, having previously conducted a surveillance which involved the Cadillac, recognized the license plate and car, connecting them to O'Neill Roberts. Kean was familiar with informants' reports which indicated that Roberts was involved in the drug traffic in the Philadelphia area, that he bought narcotics from persons who came from Los Angeles, and that he had been shot in the back and crippled during one narcotics transaction. Reports from other government agencies also indicated Roberts' involvement with narcotics.

Kean and Hobson followed the Lincoln and the Cadillac as they headed west on Old Lincoln Highway. The three cars turned onto Somerton Avenue, and the Lincoln followed by the Cadillac then turned onto Buffalo Avenue, a small residential street not far from the Hilton Inn. As Kean and Hobson continued past Buffalo Avenue, they observed the Lincoln stopped in the driveway of 2606 Buffalo Avenue and the Cadillac stopped at the mouth of the driveway. Hobson left the DEA vehicle and walked back toward Buffalo Avenue to a point where he could observe the Lincoln and the Cadillac. It was there he saw Belle talking to the occupant of the Cadillac. Belle then entered the Cadillac which turned around and retraced its path back to Old Lincoln Highway, followed by two DEA agents.

Kean and Hobson then drove slowly past the Lincoln. Kean observed Munford at the right front wheel of the Lincoln doing something under the Lincoln's hood. In total, Kean and Hobson drove past the Lincoln three times. The second and third times Kean observed Munford retrieving from somewhere under the hood of the Lincoln a number of small packets, each of which approximated in size a shotgun shell. The packets were tied together by strings. Based on his experience with narcotics, including his familiarity with the practice of packaging uncut heroin in either one-ounce packages or one-kilogram blocks, Kean believed the packages, which were roughly the size to contain one ounce of narcotics, contained heroin.

It was at that time that Kean directed the DEA agents who were following the Cadillac to stop it and identify the occupants. When the Cadillac was stopped on Old Lincoln Highway near Route 1, DEA Agent Malloy ordered the passenger to get out and identify himself. The passenger complied, giving his name as Donald Belle. Malloy after frisking Belle for weapons asked the driver, a handicapped individual, to identify himself. On learning that the driver was O'Neill Roberts, Malloy handcuffed Belle. After a report by Malloy's partner, Kean ordered the return of the Cadillac and its occupants to the Buffalo Avenue address.

Having learned that the driver of the Cadillac was indeed O'Neill Roberts, all of the individuals who were by now at the Buffalo Avenue address were detained. Agent Wasyluk, one of the agents who had brought Belle back to Buffalo Avenue, in walking up the driveway and past the Lincoln noticed that the front door was open. Looking through the open door and into the

car he saw, and thereupon directed Kean's attention to, an open brown paper "Acme" grocery bag on the floor of the Lincoln at the right front side. The top of the bag had been folded down so that it would remain open, exposing to view a number of little "silver" packets tied together with string, similar to the objects Kean had observed Munford pulling from under the hood of the Lincoln. An immediate field test was conducted on the contents of one package which indicated the presence of heroin. It was discovered that the Lincoln's air conditioning system, access to which was obtained from under the hood of the vehicle, contained a secret compartment in which packets of heroin were concealed. A further search of the vehicle produced a slip of paper dated April 27, 1976, signed by the owner, one Edward O'Neil, giving Munford and Belle permission to use his vehicle.

Belle who had remained in the ATF vehicle was advised of his constitutional rights as that vehicle proceeded to a local police station. Before arriving at the stationhouse Belle explained to Agent Wasyluk his involvement with Roberts. Wasyluk testified "[Belle] stated that he didn't know [Roberts], that this man was a stranger to him and that he had been riding along with Mr. Munford when the stranger stopped him and asked him whether or not he would be good enough to get in his vehicle because he was a cripple and whether or not he could go to the store for him; that he wanted to drive to the store and Mr. Belle could run in and bring something out to him." N.T. 85, Second Day. After Agent Wasyluk questioned Belle's recital, Belle

then stated "Well, that's my story."[2] N.T. 90, Second Day.

After arriving at police headquarters, Agent Hobson interviewed Munford who volunteered the statement which is the subject of Belle's *Bruton* argument. *See* II, *infra.*

Both Munford and Belle were indicted in a two-count indictment which charged them with conspiracy to possess, and possession with intent to distribute, heroin.[3] The district court denied Belle's pretrial motions to suppress the heroin which the DEA agents seized, as well as his motion to suppress his post-arrest statement which he made to Agent Wasyluk. Belle and Munford were jointly tried and the jury found them each guilty on both counts of the indictment on June 11, 1976. This appeal followed.[4]

## II.

On this appeal, Belle's principal contention is that certain statements made by his codefendant Munford which were admitted into evidence at their joint trial violated his Sixth Amendment right of confrontation contrary to the rule announced in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[5] Specifically, Agent Hobson testified that:

Mr. Munford stated that he had come from California and that he was going to deliver the heroin between 8:00 and 8:30 p. m. that evening of April 30th to a trash can located near the Krispy Kreme Donut Shop at Route 1 on Old Lincoln Highway. He further stated that approximately two or three times in the past he had

---

**2.** The government sought to dispute Belle's "story" and show its inherent improbability by introducing into evidence business records of the Hilton Inn and the Bell Telephone Company which revealed that a telephone call had been made from the hotel room of Munford and Belle to Roberts' home telephone a short time after Munford and Belle checked into the Hilton. (N.T. 36, 41). Thus the government sought to show that Roberts was no stranger to Belle. In addition, Hobson's testimony that Belle signalled from the Lincoln in the direction of Roberts' vehicle tends to belie Belle's statement to Wasyluk.

**3.** Roberts was not indicted.

**4.** A panel of this court affirmed Munford's conviction by judgment order on May 30, 1978. Belle's appeal, initially heard by the same panel of this court which affirmed Munford's conviction, was ordered to be reheard by the court *en banc* on July 28, 1978. The original panel opinion was ordered vacated on the same date.

**5.** We observe that Belle did not argue before the district court that his trial should be severed from Munford's because of Munford's statements despite his knowledge of those statements acquired at the suppression hearing. *See* n.9. Belle's motion to sever was predicated on other grounds and he voluntarily withdrew his motion before selection of a jury.

transported heroin into the same area and on two occasions had met with O'Neil Roberts.

N.T. 46, Second Day.[6]

After objecting to the admission of this statement and moving for a mistrial which the court denied, Belle's counsel sought an instruction that the Munford admission be considered solely against Munford,[7] and not against Belle. The district court agreed to give such an instruction at the end of Hobson's cross-examination. The instruction was not given at the end of Hobson's cross-examination,[8] but it was given shortly thereafter, at the end of the redirect examination of the next Government witness. The district court at that time charged the jury that it should consider any statements made by Munford as evidence only against Munford, and not against Belle.

**6.** At the *suppression hearing* Hobson was cross-examined by Belle's attorney and testified as follows:

QUESTION: Was Mr. Belle's name mentioned at all in your discussion with Mr. Munford?
ANSWER: Yes, it was.
QUESTION: Did you ask Mr. Munford any questions about Mr. Belle?
ANSWER: No, he just stated that he and Mr. Belle came out from California. I recall that. Now, that may not have been his exact words but that's what he inferred, the sense of his statement.
QUESTION: Did he tell you why they had come out from California?
ANSWER: Well, he came out to deliver the dope. They came out to deliver the dope.
QUESTION: All right. Now, you see, in your answer now you have given two different things. You said he and_____
ANSWER: I will say they came out to deliver the heroin.
QUESTION: I don't want you to tell me_____
ANSWER: I thought you_____
QUESTION: Well, you tell me what you remember him saying, not what you think you would like to testify to now, all right?
ANSWER: Certainly.
QUESTION: Good. Now, tell me what Mr. Munford said about them coming out from California or he coming out from California.
ANSWER: I recall Mr. Munford stating that he and Mr. Belle came out from California.
QUESTION: And what else?

Belle's contention is that Munford's reference to prior meetings with Roberts, made in the context of a statement that he, Munford, had two or three times transported heroin into the Bristol area and that the heroin on this occasion was to be delivered to the Krispy Kreme Donut Shop were highly incriminating as to Belle as a result of other evidence introduced at trial and inferences which could be drawn therefrom. He argues that the jury would infer that the prior heroin transactions were with Roberts. He also argues that the jury would infer that he was involved in the present drug transaction because he was arrested in the company of Roberts and had been at the donut shop one hour before the scheduled time for delivery. Belle argues these inferences were inevitable and highly prejudicial to him.[9]

ANSWER: And the purpose of the trip was to deliver the heroin at the Krispy Kreme Donut Shop between 8 and 8:30.
N.S.H. 289–90, Third Day.
It is highly significant that when Hobson testified at trial he eliminated all reference to Belle and to the fact that "they (Munford and Belle) came out [from California] to deliver the dope." While these deletions from Munford's statement (made to Hobson) would appear to be nothing less than a redaction, it is not necessary to our disposition that we regard Munford's statement as having been informally "redacted."

**7.** Since Munford made the admission while in custody, it was not made in the course of and in furtherance of the conspiracy. Hence it was not admissible against Belle under the co-conspirator exception to the hearsay rule.

**8.** Belle's attorney did not at this time renew his request for a limiting instruction or remind the court to give it.

**9.** Belle also complains that Munford's testimony concerning prior contact with Roberts was a surprise which prejudiced him. He states that he did not insist on a severance because prior to trial he received DEA Agent Kean's report which noted that "Munford stated that he had delivered heroin on two occasions in the past to the Philadelphia area but declined to say who he had delivered it to", but which contained no reference to Munford's prior meetings with Roberts.

We are not impressed with Belle's argument or his claimed prejudice. First, the report in

In essence, Belle is asserting that whenever a codefendant (here Munford) incriminates himself in a statement which by its express terms does not mention or refer to a joint defendant (here Belle) the *Bruton* rule will preclude its admission into evidence in a joint trial if there is any other evidence which links the complaining defendant (Belle) to the substance of the statement. We cannot agree as we do not believe that the Supreme Court in *Bruton* ever intended such a far-reaching result.

In *Bruton* two defendants—Evans and Bruton—were jointly tried. At trial, the district court admitted into evidence testimony by a postal inspector of Evans' oral confession. That confession named Bruton as an accomplice. An instruction limiting the jury's use of the confession as against Evans only was given by the district court, relying on *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). In overruling *Delli Paol,* the Supreme Court, reversing Bruton's conviction, held that Evans' extrajudicial statement—which made reference to codefendant Bruton— was inadmissible as evidence at the joint trial and could not be cured by a limiting instruction.

■ The key to *Bruton* was that the extrajudicial statement by the nontestifying codefendant Evans was "powerfully incriminating" of Bruton in that it named Bruton as an accomplice. It was in such a circumstance—where the challenged *statement* (and we emphasize, the *statement only*) directly implicated the complaining defendant Bruton—that the Supreme Court held that the codefendant's statement could not be admitted into evidence at a joint trial.

*See United States v. DiGilio,* 538 F.2d 972 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).

When a codefendant's extrajudicial statement does not directly implicate the defendant, however, the *Bruton* rule does not come into play. *See United States v. Gerry,* 515 F.2d 130 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *Nelson v. Follette,* 430 F.2d 1055, 1057 (2d Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971). For example, courts—ours included—have consistently approved the use at joint trials of codefendants' confessions where all references to the complaining defendant have been redacted, at least if the redacted versions do not explicitly suggest the participation [10] of the complaining defendant. *E. g., United States v. Stewart,* 579 F.2d 356 (5th Cir. 1978); *United States v. Holleman,* 575 F.2d 139 (7th Cir. 1978); *United States v. Dady,* 536 F.2d 675 (6th Cir. 1976) (per curiam); *United States v. Wingate,* 520 F.2d 309 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. Alvarez,* 519 F.2d 1052 (3d Cir.), *cert. denied,* 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975); *United States v. Panepinto,* 430 F.2d 613 (3d Cir.), *cert. denied,* 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970); *United States v Lipowitz,* 407 F.2d 597 (3d Cir.), *cert. denied,* 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969). *See United States v. DiGilio, supra,* at 982.

■ If a codefendant's confession or admission is admissible at a joint trial when the names of other joint defendants have

question was prepared by Agent Kean, not Agent Hobson, and Hobson in his pretrial testimony stated that not everything he told Kean was placed in the report. N.T. 51, Second Day. Moreover, in his pretrial testimony Agent Hobson testified that Munford had said that he (Munford) had met with Roberts twice in the past. N.S.H. 282, Third Day; N.T. 57, Second Day (statement by trial court as to its recollection and notes of Hobson's pretrial testimony). Thus, Belle's counsel was well aware before trial of the contents of Munford's admission to Hobson, just as he had to have been alerted to the fact that Kean's report was incomplete.

**10.** *See Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In *Harrington* a white defendant was tried with three black codefendants. The defendant had made statements placing him at the scene of the crime. The confession of a nontestifying codefendant, which did not name the defendant but which referred to the "white guy", was admitted. The court assumed that this had the same effect as naming the defendant. The court nonetheless found the error to be harmless.

simply been redacted,[11] it would seem that *a fortiori* an admission such as the one here which makes no reference whatsoever to any other defendant should be admissible as well. In *United States v. Wingate, supra,* a codefendant's redacted statement had been admitted into evidence with cautionary instructions. The complaining defendant (Wingate) argued that the statement, read in light of other evidence connecting him (Wingate) to the codefendant who made the statement, tended to identify him as a co-conspirator, and therefore its admission into evidence violated *Bruton.* The Second Circuit disagreed, reasoning that the codefendant's statement did not sufficiently incriminate Wingate inasmuch as "[o]nly when combined with considerable other evidence, which amply established Wingate's guilt, [did] the statements tend to implicate him", 520 F.2d at 314. Thus the court held that the codefendant's statement was not "powerfully incriminating" as to Wingate. In short, evidentiary linkage or contextual implication may not be utilized to convert a non-*Bruton* admissible statement into a *Bruton* inadmissible statement.

■ The situation here is quite similar to that in *Wingate.* Belle argues that Munford's statement inculpates him. But if it does, it does so only insofar as other evidence may connect Belle to Munford and to O'Neill Roberts. In such a case, we do not believe that the *statement qua statement* can be said to be "powerfully incriminating" *as to Belle,* and thus inadmissible under *Bruton.* Other courts faced with similar claims have held that the admission of a codefendant's extrajudicial statement did not violate *Bruton. See United States v. Mulligan,* 488 F.2d 732 (9th Cir. 1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974); *Nelson v. Follette,* 430 F.2d 1055 (2d Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971).

In *Nelson,* a case with a fact pattern analogous to the one in this case, the complaining defendant Nelson and a codefendant Biggins were jointly tried and convicted of felony murder in the course of a bar hold-up. Two confessions by Biggins were introduced into evidence, with an instruction that they be considered only with respect to Biggins. Biggins did not take the stand. Biggins' statements did not directly identify Nelson, but rather referred to an "Oliver" who had a physical description more or less fitting Nelson. Biggins had also stated that he ran into "Oliver" at another bar earlier in the evening of the murder, and that they had proceeded together to the bar at which the murder took place. Nelson contended that these statements, when considered in light of testimony by the manager of the first bar to the effect that he had seen Nelson and Biggins together at his bar on the evening in question, "necessarily implicated" him (Nelson).

The court rejected Nelson's contention. It noted that "for the *Bruton* rule to apply, the challenged statements must be clearly inculpatory." 430 F.2d at 1057. The court held that since the jury would have to make substantial inferences to implicate Nelson in the crime by virtue of the testimony as to his mere presence at the first bar, Biggins' statements were "not clearly inculpatory because they *alone* did not serve to connect Nelson with the crime." *Id.* at 1058 (emphasis added). *See United States v. Lipowitz, supra,* 407 F.2d at 602–03. The court also noted that the "connecting testimony" (*i. e.* the bar manager's testimony) *was* subject to cross-examination. Here, we observe that whatever connecting evidence there was, could have been tested by calling Roberts as a witness.

In *United States v. Mulligan, supra,* a defendant objected on *Bruton* grounds to the introduction of admissions by his two codefendants (who did not take the stand). There had been a limiting instruction. The admissions did not directly implicate the complaining defendant. The court rejected this contention, stating:

11. However, compare Hobson's trial testimony reproduced at pp. 7–8 *supra,* with his testimony at the suppression hearing at n.6, as effecting an informal redaction with respect to Belle's identity and activities.

Appellants argue that the admission of these statements violated *Bruton v. United States,* 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. In that case, the Court held that the introduction of an extrajudicial admission of one defendant that implicates or inculpates a co-defendant violates that co-defendant's sixth amendment right to confrontation. Appellants' reliance on *Bruton* is misplaced. Mulligan's statements inculpated only Mulligan. Dinsio's statements inculpated only Dinsio. Appellants ask us to extend the *Bruton* rule to exclude the admission of one defendant even though the admission does not directly implicate a co-defendant. We decline to do so.

There is little danger that a jury in a joint trial, in weighing the evidence against A, will consider against A an admission by B concerning only B's activities. Following the appellants' argument to its logical conclusion would require separate trials in every case where any defendant has made an admission. Such a holding is wholly unwarranted. 488 F.2d at 737.

We agree with the reasoning of *Nelson* and *Mulligan* and are satisfied that the rationale of those cases applies equally in this case. Munford's admissions directly implicate only Munford. Unlike *Bruton,* they do not shift responsibility to Belle. The challenged statements implicate Belle only to the extent that the jury may make inferences based on other clearly admissible evidence which may tend to connect Belle to Munford and Roberts. Accordingly, we are not persuaded that Munford's statements can be said to be "clearly inculpato-ry" or "powerfully incriminating" as to Belle.[12] Moreover, all the "connecting testimony" was subject to cross-examination. Consequently, we are convinced that the introduction into evidence of Munford's statement did not contravene *Bruton* or violate Belle's right to confront witnesses against him.[13]

Indeed, in *Bruton* the Supreme Court was fully aware of the problems presented by the joint trial of more than one defendant, and took pains to discuss in some detail the provisions of Fed.R.Crim.P. 14, which authorizes a severance, as that rule was implicated by the *Bruton* doctrine. 391 U.S. at 131–32, 88 S.Ct. [1620] at 1625. In discussing the 1966 amendment to Rule 14, the Court pointed out that the amendment "provide[d] expressly that '[i]n ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.'" *Id. quoting* Fed.R.Crim.P. 14.

It is highly significant that neither the federal rule examined by the Court, nor Mr. Justice Brennan's majority opinion, made any reference to any judicial inspection of evidence other than the statements or confessions of the defendants. If linkage evidence was subsumed by the Court in its *Bruton* ruling, it is apparent that such linkage evidence would be required to be subjected to judicial scrutiny together with the defendants' statements or confessions. No such suggestion is even intimated by *Bru-*

**12.** In *Bruton,* one of the Court's concerns was the unreliability of statements by a codefendant which tend to shift responsibility to an accomplice, especially when such evidence cannot be tested by cross-examination. 391 U.S. at 136, 88 S.Ct. 1620. In this case Munford's statements in no way shift blame to Belle or to anyone else, and there is consequently no reason to suspect their reliability. Thus one of the principal concerns of the Court in *Bruton* is lacking in the situation presented by this case, where the codefendant's statements do not directly implicate the defendant. *See Nelson v. Follette, supra,* 430 F.2d at 1059.

**13.** It was of course necessary that the jury be instructed to consider Munford's statement as evidence against Munford only, and not against Belle. We discern no prejudice that Belle suffered by the fact that such an instruction was not given at the end of Hobson's testimony, but was rather given at the end of the testimony of the next Government witness (22 transcript pages later), especially since Belle's attorney did not renew his request for a limiting instruction at the end of Hobson's testimony.

*ton,* and it is understandable why it was not. To require what Belle seeks here would lead to the necessity for the Government to expose its entire case on a motion for severance. Indeed, whether or not a motion for severance is ever made, such a result would require the trial judge to examine under a microscope all the prosecution's evidence in order to determine whether any extrajudicial statement made by a nontestifying codefendant could be admitted as to that defendant, or whether it would have to be excluded because of the existence of independent "linkage" evidence which might connect another defendant to the statement. This result would necessarily lead to either a complete "mini-trial" before the judge, or to the practical prohibition of joint trials. *See* pages 493 494 *supra; United States v. Mulligan, supra.* The federal rules do not contemplate such a practice, *see* Fed.R.Crim.P. 14; *Bruton* itself never suggested such an astonishing result; and no other court, to our knowledge, has construed *Bruton* in the unprecedented fashion urged upon us by Belle.

We hold therefore that the district court properly admitted Munford's statement into evidence.

### III.

#### A

Belle argues that there were no reasonable grounds for his detention on Old Lincoln Highway, that his detention constituted an arrest not based on probable cause, and that as a result the heroin, as well as his statement made to Agent Wasyluk, should have been suppressed as fruits of an illegal arrest. The district court concluded that there were reasonable grounds for Belle's detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969) and that the agents in handcuffing and transporting Belle to Buffalo Avenue were merely maintaining the *status quo* of the *Terry* stop. The district court also held that (1) it was unnecessary to determine when the moment of arrest occurred as Belle's statement was not made until after the heroin was field tested; (2) that the seizure of the

heroin was not the product of Belle's detention or arrest; and (3) that probable cause for Belle's arrest clearly existed once the heroin had been discovered. As a result, the district court determined that Belle's statement was not the fruit of any illegal arrest. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The district court also ruled that the heroin seized was in plain view and that any search of the Lincoln was based on probable cause under exigent circumstances.

We agree with the district court that there were ample grounds for a *Terry* stop of the Cadillac in which Belle was riding. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) permits an investigatory stop where the facts available to the officer at that moment " 'warrant a man of reasonable caution in the belief' that the action was appropriate." 392 U.S. at 22, 88 S.Ct. at 1880. Here, Kean, who had ordered the DEA agents to stop the Cadillac, had reason to believe the Cadillac was registered to a known drug dealer; that Munford and Belle were together; that Belle had some relationship to the Lincoln; that Belle was in the Cadillac with a then unidentified driver; and that the Lincoln which appeared in some way to have some connection with the Cadillac had just disgorged a number of packets which Kean reasonably believed to contain drugs. Under these circumstances the district court was clearly correct in holding that the agents' action in stopping the Cadillac was appropriate. *See also Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Belle, however, complains not so much that the *Terry* stop was impermissible but that probable cause was lacking for his arrest and that when he was handcuffed and transported back to Buffalo Avenue in the ATF vehicle he was clearly under arrest. *United States v. Lampkin,* 464 F.2d 1093, 1095 (3d Cir. 1972).

The district court did not determine whether probable cause existed for Belle's arrest at the Cadillac, holding instead that probable cause existed once the heroin had been field tested. Whereas in normal course we might be persuaded to remand to the district court for its initial determination of probable cause, here the record is sufficient for that determination to be made by this court. The Supreme Court in *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), in addressing the very same question but in a state court context, stated

> While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental—*i. e.,* constitutional—criteria established by this Court have been respected.

374 U.S. at 34, 83 S.Ct. at 1630.[14]

The record here reveals that at the moment that Belle was handcuffed the DEA and ATF agents [15] were aware of the following information: (1) that the Lincoln was owned by Edward O'Neil, reputed to be a major trafficker in heroin; (2) that the Lincoln reputedly had a secret compartment in which heroin could be hidden; (3) that the Lincoln was in the Bristol area, an area where O'Neil normally made his last stop after cross-country travels; (4) that Belle and Munford fit O'Neil's description; (5) that Belle and Munford met Roberts at a prearranged rendezvous at a donut shop at which time Belle was observed signalling in the direction of Roberts' car; (6) that Roberts in his Cadillac (which was known to Kean) followed the Lincoln to a Buffalo Avenue address; (7) that Kean, on the basis of various reports, believed Roberts to be involved in heroin traffic and to consort with known narcotics dealers; (8) that Kean was aware of informants' reports which attributed Roberts' source of supply to someone from Los Angeles, where O'Neil resided; (9) that Belle had been observed conversing with Roberts and then entering Roberts' car which headed back to the locale of the ostensible rendezvous; (10) that Munford was observed removing a large number of small packets thought to be heroin from under the hood of the Lincoln; and (11) that Roberts had been positively identified as the driver of the Cadillac.

■ Belle, however, argues that this collective knowledge was insufficient to establish probable cause for his arrest. He claims that the reports pertaining to Edward O'Neil were too old to be relied upon and that none of the reports or informants had the indicia of reliability required by *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1969). We need not decide here whether Belle is correct in this contention, for the *Spinelli* and *Aguilar* standards of reliability are applicable only when the reports are the sole basis for a finding of probable cause. Here, as we have noted, the agents by surveillance made personal observations of Belle, Roberts and Munford,

---

**14.** *See also, United States v. Cutting,* 552 F.2d 761, 763 (7th Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977), (appellate court may review factual findings of trial judge and consistent portions of record in order to assess legal conclusion of probable cause), *United States v. One Twin Engine Beech Airplane,* 533 F.2d 1106, 1109 (9th Cir. 1976) (determination of probable cause is an application of a rule of law subject to independent appellate review while underlying findings of fact by trial judge entitled to deference).

**15.** The collective knowledge of the investigating officers is measured in determining probable cause. *See, e. g., United States v. Ashley,* 569 F.2d 975, 983 (5th Cir. 1978), *United States v. Woods,* 544 F.2d 242, 260 (6th Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270, *reh. denied,* 431 U.S. 960, 97 S.Ct. 2689, 53 L.Ed.2d 279 (1977), *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972), *Williams v. United States,* 113 U.S.App. D.C. 371, 372, 308 F.2d 326, 327 (1962), *United States v. Bianco,* 189 F.2d 716, 719 (3d Cir. 1951).

which substantiated the background information gleaned from the reports,[16] information therefore which, under these circumstances, could permissibly be considered by the agents. *See United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). In sum, given the information contained in the reports, Belle's actions on the day of arrest, as well as the actions of his associates, the various government agents might well have reasonably believed that Belle was involved in a drug-related transaction. *See Whitely v. Warden,* 401 U.S. 560, 567, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

■ Belle also argues that each occurrence which we have detailed was consonant with innocent activity and thus could not give rise to the probable cause for his arrest. In so arguing, however, Belle loses sight of or downplays what we regard as the most critical fact of all, *viz.,* the probable possession of heroin by Munford, Belle's associate. Belle's actions became more consistent with *criminal* rather than with innocent behavior when viewed in the context of: (1) the information which the agents had previously received and (2) their observations of Munford who had been seen extracting suspicious packets from a hiding place in the Lincoln. We think it was quite reasonable for the agents to infer, based on prior information and the actions of Munford, Belle, and Roberts, that all three were involved in a drug transaction. Even if we were to assume *arguendo* that each of

Belle's actions was susceptible of an innocent explanation, Belle's argument would nevertheless fail in light of the totality of the circumstances present here, just as a similar argument in an analogous situation was rejected by the Ninth Circuit in *United States v. Patterson,* 492 F.2d 995, 997 (9th Cir.), *cert. denied,* 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974). The defendants there had asked border patrol agents for directions to San Diego but after receiving them, proceeded in the opposite direction; used the telephone before going to an area where smuggling was known to take place; were observed at a ranch house loading burlap bags into their car; and departed the ranch house early in the morning, many hours after they had arrived. After acknowledging that each of these events could be innocently explained, the court concluded that:

> The succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.

492 F.2d at 997.

Indeed, the facts of the instant case seem strikingly akin to those which appear in *United States v. Lampkin,* 464 F.2d 1093 (3d Cir. 1972), where this court upheld the arrest of a person not yet identified, based upon his associations coupled with a behavior pattern which, as here, bespoke criminal complicity.[17]

16. The trial court found in the alternative that, if *Spinelli* and *Aguilar* were applicable, the reports and informants satisfied the requisite indicia of reliability. Trial court op. at 7 n. 3.

17. The court in *Lampkin* stated:

There were far too many interrelated factors to have been the result of pure coincidence. First of all, the former undercover agent recognized one of the occupants of the car and associated the car itself with his previous undercover narcotics work. Other pertinent elements were that the auto was registered to one whose name had previously been linked with wrongful narcotics activities; that those activities seemed to center between Pittsburgh and New York; that this suspect's flight was going to the New York area; and that he was interested in an imme-

diate return. Appellant's outward journey actually ended in Harlem in close proximity to a store run by a man already suspected of drug trafficking between New York and Pittsburgh, and a return flight to Pittsburgh took place early that same day. A further reason for the agent's actions was the police report (which is now thought to have been seemingly erroneous) that there was a state warrant existing for Lampkin to whom the car was registered. Considering all these factors, it is obvious that each incident corroborated the existing belief of the agent. There were too many factors which "fell into place" and thus probable cause in such circumstances seems readily existent.

464 F.2d at 1096.

■ We are satisfied that the DEA agents had probable cause, based on the available background reports as to O'Neil and Roberts, and based on Belle's actions as well as those of Munford and Roberts, to arrest Belle. *Cf. Government of the Virgin Islands v. Hernandez,* 508 F.2d 712 (3d Cir.), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2659, 45 L.Ed.2d 695 (1975).[18] That being so, the district court did not err in refusing to suppress Belle's post-arrest statement, albeit the ground on which the district court relied was different than the basis on which we affirm its ruling. *Cf. PAAC v. Rizzo,* 502 F.2d 306 (3d Cir.), *cert. denied,* 418 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

B

Belle also complains that the heroin was improperly seized from the Lincoln in that the seizure did not fall within any of the exceptions to the Fourth Amendment warrant requirement, and that as a consequence the district court erred in refusing to suppress the introduction of the heroin into evidence.[19] We cannot agree.

Although the district court confined its analysis primarily to the plain view doctrine as espoused in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), we cannot help but observe that under *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), as well as *Coolidge v. New Hampshire, supra,* the heroin was properly seized without a warrant.

*Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968), states the long-settled rule that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." In *Harris,* a police officer had discovered the registration card which was sought to be suppressed not as the result of a search of the vehicle, but rather because he was complying with a valid regulation of the police department designed to protect automobiles and their contents when automobiles are taken into police custody. In implementing these protective measures, "[the police officer] . . saw the registration card, which lay face up on the metal stripping over which the door closes." 390 U.S. at 235–36, 88 S.Ct. at 993. The Supreme Court held that the discovery of the card under these circumstances did not constitute an illegal search. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), decided by the Supreme Court subsequent to *Harris,* made explicit the requirement that the objects seen in plain view must be discovered through inadvertence. *Coolidge v. New Hampshire,* 403 U.S. at 469, 91 S.Ct. 2022.

Relying on the authority conferred upon police officers by *Terry v. Ohio,* 392 U.S. 1,

---

**18.** Even if there had not been probable cause to arrest Belle at the Cadillac, any illegality in his arrest would be attenuated by the subsequent discovery of heroin and of the note from Edward O'Neil giving Munford and Belle permission to use his car. The district court had found that the seizure of the heroin was not the fruit of Belle's arrest. Moreover, it will be recalled that Belle's statement was not made until *after* the heroin seizure and the search of the Lincoln. Hence even if no probable cause existed prior to that time, independent probable cause existed to arrest Belle at that time and before any statements were made to the agents. *United States ex rel. Wright v. Cuyler,* 563 F.2d 627, 631 (3d Cir. 1977); *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 925 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95

S.Ct. 829, 42 L.Ed.2d 839 (1975), 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

**19.** *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), was not decided until December 5, 1978, considerably after the panel and *en banc* arguments in this case. It is understandable, therefore, why neither party argued the issue of whether Belle had a constitutionally protectible "legitimate expectation of privacy" in the Lincoln and its contents. *Rakas v. Illinois,* —— U.S. at —— – ——, 99 S.Ct. at 433. While we believe that in light of *Rakas,* Belle would be hard-pressed to sustain his argument, we need not decide the issue of whether a co-borrower of an automobile may have such a constitutional interest in the borrowed vehicle in view of our holding that the seizures

88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[20] the district court concluded that the officers were rightfully on the Buffalo Avenue premises, and further found that the discovery of the heroin was inadvertent.[21] Our review of the record reveals ample support for the district court's conclusion and finding.

■ Moreover, although not necessary to its determination, the district court made additional findings substantiating its conclusion that exigent circumstances appeared which would authorize the warrantless seizure under *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). These findings were as follows:

> Given the speed with which the events had unfolded to that point, it would have been highly impracticable to secure a warrant. Despite the fact that Munford and Belle had been detained, the agents were faced with the possibility that the suspected contraband, which was not only incriminating but which had a high dollar value, might be retrieved by someone else. The risk of interference was greater than if the Lincoln had been stopped on a highway. As the officers knew, Munford had driven to this residence and obviously felt it to be a safe place because he immediately began to take the heroin from beneath the Lincoln's hood. The agents knew of the woman who had been observed with Belle at the motel. She had a car and had given some direction to

Belle. For all the officers knew, there may have been a variety of confederates watching from the house or on call nearby, some or all of whom may have been armed.

Dist.Ct.Op. at 12–13. We cannot say these findings are clearly erroneous. Under either the plain view doctrine or the exigent circumstances analysis, the warrantless seizure of the heroin was justified. Belle's motion to suppress was therefore properly denied.

## IV.

We have determined that the district court did not transgress the *Bruton* rule and thus did not err in admitting Munford's statements into evidence. We have also determined that the district court properly denied Belle's motion to suppress his post-arrest statements and Belle's motion to suppress the heroin.

■ Belle has contended on appeal before us that the district court should have granted his Rule 29 motion (for judgment of acquittal because of insufficient evidence); that it impermissibly summarized the evidence in a manner prejudicial to him (Belle); that the remarks of the United States Attorney in his closing argument denied Belle the constitutionally protected right to a fair trial; and that the district court erred in admitting into evidence the

did not violate any Fourth Amendment guaranty.

20. The district court concluded that *"Terry v. Ohio* gives an officer the right to protect himself from possible attack, and for this reason, . . . Wasyluk was acting properly and had a legitimate reason for looking into the vehicle and, therefore, that the plain view doctrine justified the seizing of the heroin." Dist.Ct.Op. at 11.

21. With respect to the inadvertence of the discovery, the district court made the following findings, none of which are "clearly erroneous:"

> Here, defendants argue that the discovery of the heroin in the open shopping bag was not inadvertent but the facts related convinced me to hold otherwise. Agent Wasyluk, who

first saw the bag and its silver packets, had not observed Munford removing them from their hiding place. Rather, Wasyluk was one of the officers who had brought Belle back to Buffalo Avenue. On arrival, Wasyluk got out of the car and started down the drive toward Munford who was close to the Lincoln. Its door was open and Wasyluk looked into the vehicle to see if anyone was there. On the floor at the front of the passenger's seat, he saw the open shopping bag and its contents. This occurred while Agent Kean was pursuing another suspect. When Kean returned, Wasyluk told him about the bag and its parcels and both men looked at them. Having seen these objects being pulled from the car by Munford, Agent Kean arrested him. Dist.Ct.Op. at 10–11.

money found in the possession of O'Neill Roberts.[22]

We have examined the record with respect to each of these contentions and find they are without merit.

## V.

The judgment of the district court will be affirmed.

GIBBONS, Circuit Judge, with whom ALDISERT, Circuit Judge, joins, dissenting:

Following his arrest for possession of heroin with intent to distribute, appellant's codefendant, Joe C. Munford, made a self-incriminatory statement to Agent Stephen Hopson. Subsequently, at the joint trial of Munford and appellant Donald E. Belle, the prosecuting attorney elicited from Hopson the following recitation of Munford's remarks:

Mr. Munford stated that he had come from California and that he was going to deliver the heroin between 8 and 8:30 P.M. that evening of April 30th to a trash can located near the Krispy Kreme Donut Shop at Route 1 on Old Lincoln Highway.

He further stated that approximately two or three times in the past he had transported heroin into the same area and on two occasions had met with O'Neil Roberts.

N.T. 46, Second Day. Belle objected to the introduction of this testimony, urging that it constituted "the most incriminating piece of evidence in this case." *Id.* at 49. He contended at trial, and asserts on appeal, that the introduction of Munford's statement, even with an instruction directing the jury to consider it exclusively against Munford, violates the Supreme Court's mandate in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This is so, Belle argues, because despite the instruction, the jury might have inferred from Munford's admission that Roberts was generally involved in narcotics transactions and thus that Belle—who was arrested in Roberts' company—was guilty as charged. Moreover, since the *remaining* circumstantial evidence linking Belle to an illicit narcotics arrangement was, at best, fragile, the use of this hearsay testimony, and the resulting violation of Belle's Confrontation Clause rights under *Bruton,* were not harmless beyond a reasonable doubt. *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, Belle urges, his conviction should be reversed.

The majority rejects Belle's position, holding that the introduction of Munford's statement at the joint trial did not transgress appellant's rights under *Bruton.* "The key to *Bruton,*" the majority intones, "was that the extrajudicial statement by the nontestifying codefendant   .   .   . was 'powerfully incriminating' of Bruton in that it named Bruton as an accomplice. It was in such a circumstance—where the challenged *statement* (and we emphasize, the *statement only*) directly implicated the complaining defendant Bruton—that the Supreme Court held that the co-defendant's statement could not be admitted into evidence at a joint trial." Opinion, *supra* at 493 (emphasis in the original). Because Munford's testimony inculpated Belle "only insofar as other evidence may connect Belle to Munford and to O'Neil Roberts," *id.* at 494, no *Bruton* violation was presented.

Unhappily, the majority reads *Bruton* as if it were construing the terms of a carefully drafted contract. At no point does it offer a theory of that case or refer, even casually, to the general purposes of the Confrontation Clause. Rather, it extracts from *Bruton* the phrase "powerfully incriminating," and, citing to a litany of cases wrenched hopelessly out of context, concludes that Belle's predicament is not covered. I do not find the words "powerfully incriminating" to be magically self-explanatory, and I cannot accept an elucidation of

22. The agents found $1300 in Roberts' possession after transporting Roberts, Belle and the others to the stationhouse.

the Confrontation Clause so lacking in analytical exposition. I respectfully dissent.

## I. BRUTON v. UNITED STATES AND THE CONFRONTATION CLAUSE

From the majority opinion alone, one might suppose that the 1968 decision in *Bruton* was the Supreme Court's first and final word on the rights of criminal defendants under the Confrontation Clause.[1] Of course, this is not the case. While courts have long struggled with the question of what substantive limitations, if any, are placed by the Confrontation Clause on the introduction of evidence, it was in *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), that the Supreme Court began to delineate the precise relationship between the right of confrontation and the production of evidence at trial. Rejecting years of contrary precedent,[2] the *Pointer* Court held that the Confrontation Clause is applicable to state criminal proceedings through the fourteenth amendment. In so ruling, it paved the way for a number of decisions scrutinizing the interplay between the hearsay rule and the Confrontation Clause.[3]

In *Pointer* petitioner and another defendant had robbed one Phillips. During a preliminary hearing at which the defendants were not represented by counsel, Phillips testified against both defendants. When the case was tried, however, Phillips had moved out of state. The prosecution therefore introduced, over petitioner's unsuccessful objection, the transcript of the preliminary hearing. Petitioner was convicted, and the Supreme Court granted certiorari. Writing for a unanimous Court, Justice

Black set aside petitioner's conviction. His opinion is noteworthy in that it suggests both the structure and the limitations of the right of confrontation. On the one hand, Black noted, the Confrontation Clause includes a right of cross-examination, a central purpose of which is to "expos[e] falsehood and bring . . . out the truth in the trial of a criminal case." 380 U.S. at 404, 85 S.Ct. at 1068. Where, as in *Pointer,* the "statement offered against petitioner at his trial ha[s] not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity [for] cross-examin[ation] . . ., its introduction . . . in a criminal case against [the petitioner] . . . amount[s] to denial of the privilege of confrontation guaranteed by the Sixth Amendment." *Id.* at 407, 85 S.Ct. at 1070. The Confrontation Clause thus serves an instrumental, truth gathering function insofar as it limits substantively the kinds of evidence that may be introduced against an accused. In addition, Black intimated that the Clause protects intrinsic, "fundamental" values, essential to due process and wholly separate from the more instrumental concern for truth gathering. *Id.* at 404–05, 85 S.Ct. 1065. On the other hand, Black observed, the dictates of the Clause are not absolute; some evidence, technically hearsay in nature, may nevertheless be admitted. Within this latter category, Justice Black included dying declarations and former trial testimony of a deceased witness. *Id.* at 407, 85 S.Ct. 1065.

*Pointer* provided an initial outline of the content of defendants' Confrontation Clause rights. It isolated both the intrinsic interests of due process and fairness[4] and

1. The Confrontation Clause in the sixth amendment to the United States Constitution provides "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

2. *See, e. g., Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), *overruled on other grounds, Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *West v. Louisiana,* 194 U.S. 258, 264, 24 S.Ct. 650, 48 L.Ed. 965 (1904), *overruled, Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923

(1965). *See also* Note, *Confrontation and the Hearsay Rule,* 75 Yale L.J. 1434, 1434 (1966).

3. *See infra* at 502–508.

4. The intrinsic fairness interests served by the Confrontation Clause doubtlessly trace historically to the procedural abuses common during the colonial era. *See* Baker, *The Right to Confrontation, The Hearsay Rules, and Due Process—A Proposal for Determining When Hearsay May Be Used in Criminal Trials,* 6 Conn.L. Rev. 529, 532 & n. 16 (1974); Griswold, *The*

the important instrumental interest of truth gathering as significant underpinnings of the right of confrontation. At the same time, it suggested that there are limitations on the reach of the Clause, and left open the possibility that the right of confrontation might in the future be found inapposite where the evidence in question satisfied certain yet unspecified indicia of reliability. *Id.* at 407, 85 S.Ct. 1065. But *Pointer* was merely a preliminary foray; in a companion case, *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the Court elaborated further its *Pointer* reflections.

In *Douglas* two defendants were tried separately on charges of assault with intent to murder. After the first defendant, Loyd, was convicted, he was called to testify at the trial of the second. Because he planned to appeal his conviction, however, Loyd refused to answer any of the questions put to him. The prosecutor thereupon produced what purportedly was Loyd's confession, which he read aloud, in the presence of the jury, in the guise of cross-examination. The confession incriminated petitioner, who was subsequently convicted.

In reversing Douglas' conviction, Justice Brennan, writing for a unanimous Court, picked up where Justice Black in *Pointer* had left off. While Black had made clear that the Confrontation Clause places substantive limits on the introduction of hearsay, he had had no occasion to specify in detail the *kinds* of hearsay that would violate the mandate of the Clause. Justice Brennan turned to this issue directly.

> The statements from the document as read by the Solicitor recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the petitioner as the person who fired the shotgun blast which wounded the victim.

380 U.S. at 417, 85 S.Ct. at 1076. Justice Brennan thus identified *two* kinds of hearsay statements which may unlawfully prejudice a defendant: (1) those that provide testimony substantially *linking* the defendant to the crime (hereinafter referred to as "linkage" testimony), and (2) those that name or identify the defendant as a participant. That Justice Brennan regarded *both* kinds of remarks as potentially impermissible is again reflected later in his opinion:

> In the circumstances of this case, petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. Loyd's alleged statement that the petitioner fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder.

*Id.* at 419, 85 S.Ct. at 1077.

But *Douglas* does not simply *identify* two kinds of testimony—directly accusatory and linkage—as potential violations of the Confrontation Clause. In addition, the case relates those forms of hearsay to a deeper, harm-focused theory of the Confrontation Clause. Though he did not abandon the willingness expressed in *Pointer* to permit some hearsay testimony, Justice Brennan regarded as a violation of the Clause the introduction of all substantially harmful testimony as to which no cross-examination was available. Naturally, what might constitute substantially harmful testimony would depend on the facts of each case and, in particular, on the totality of the evidence adduced by the prosecutor against a given defendant. Where the challenged evidence is essential to the prosecutor's case, however, and thus particularly prejudicial to the defendant, Justice Brennan left no

*Due Process Revolution and Confrontation,* 119 U.Pa.L.Rev. 711, 712 (1971). Trial by affidavit and contentions by faceless witnesses particularly underlay the Framers' concerns. Many of these abuses were epitomized in the trial of Sir Walter Raleigh; indeed, several commentators trace the Confrontation Clause to the common law reaction against the abuses in the Raleigh trial. *See* F. Heller, *The Sixth Amendment* 104–05 (1951); 1 J. Stephen, *A History of the Criminal Law of England* 333–36 (1883).

doubt that Confrontation Clause values would be implicated.

> This case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. *The alleged statements clearly bore on a fundamental part of the State's case against petitioner.* The circumstances are therefore such that "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant."

*Id.* at 420, 85 S.Ct. at 1077 (quoting *Namet v. United States,* 373 U.S. 179, 187 (1963)) (emphasis supplied).

It is in the light of the analytical framework provided by *Pointer* and *Douglas* that Justice Brennan's reference, three years later, to "powerfully incriminating" testimony in *Bruton* must be viewed. The majority construes that phrase to limit the protections of the Confrontation Clause solely to cases where the extrajudicial remark, by itself, accuses the defendant directly. But if Justice Brennan had intended to exclude linkage testimony from the protections of the Confrontation Clause, surely he would have chosen to restrict, or at least to distinguish, his holding in *Douglas* to the contrary. He did not. Indeed, he relied broadly on *Douglas* in reaching his decision, and in no respect intimated any change of heart. *See* 391 U.S. at 126–28, 88 S.Ct. 1620.

The majority goes awry by failing to consider the limited context in which Justice Brennan made reference to the "powerfully incriminating" testimony. In *Bruton,* unlike in *Douglas* and *Pointer,* the lower court had instructed the jury to consider the challenged hearsay only against the declarant. Thus, the *Bruton* Court considered whether such an instruction could effectively erase the inadmissible statement from the jurors' minds. Reversing prior case law to the contrary,[5] the Court held that where, as in *Bruton,* the "powerfully incriminating extrajudicial statements of a codefendant, who stands side-by-side with the defendant, are deliberately spread before the jury in a joint trial," *id.* at 135–36, 88 S.Ct. at 1628, the jury cannot be expected to ignore them in evaluating the case against the defendant. The *Bruton* Court thus acknowledged that hearsay statements which directly accuse, and thus devastatingly incriminate a defendant, cannot be erased by simple instructions to the jury. But *Bruton* did not hold that *only* such statements will receive scrutiny under the Confrontation Clause. Justice Brennan did not retreat an inch from his *Douglas* position on the prejudice arising from especially harmful linkage testimony.

Indeed, there are suggestions in *Bruton* which expressly affirm the harm-focused conception of *Douglas.* For example, Justice Brennan wrote, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, *and the consequences of failure so vital to the defendant,* that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. at 1627 (emphasis supplied). Brennan thus identified *two* considerations—the *risk* of improper jury use of testimony, and the *harm* to the defendant—both of which must be considered in deciding Confrontation Clause cases.[6] Either or both could conceivably trigger constitutional concerns. Justice Brennan referred to "powerfully incriminating" testimony simply to establish why a high risk factor was present under the *Bruton* facts.[7] *Id.* at 135–36, 88 S.Ct.

---

**5.** *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

**6.** *See The Supreme Court, 1967 Term,* 82 Harv. L.Rev. 63, 234 (1968).

**7.** Of course, Justice Brennan did not suggest that the risk that juries would improperly consider inadmissible testimony was *solely* the product of its "powerfully incriminating" character. Even if certain evidence does not, by itself, incriminate a defendant, but simply stands out as a substantial link in the prosecutor's chain of evidence, a jury may still be unable to avoid using it against the defendant. Thus, the risk of improper jury use of hearsay evidence, which is truly the "key to *Bruton,*" is a risk that is posed both by inherently accusa-

1620. As for harm, he left intact his earlier observation in *Douglas* that where the challenged statements are prejudicial, in that they "clearly bore on a fundamental part of the State's case against petitioner,". 380 U.S. at 420, 85 S.Ct. at 1077 a confrontation right is violated. Plainly, linkage testimony is often of this sort, especially in cases built upon circumstantial evidence.[8]

The majority, in its studied effort to avoid "a far-reaching result," Opinion, *supra* at 493, unduly constricts the meaning of *Bruton*. It woodenly extracts the phrase "powerfully incriminating," intended by Justice Brennan simply to describe one kind of statement that could not be erased from the jurors' minds, and concludes that only such hearsay statements are proscribed by the Confrontation Clause.[9] But the Supreme Court's analysis, as I have suggested, is more complex.[10] At least as of 1968, the application of the Confrontation Clause, for purposes of regulating the introduction of hearsay evidence, required the consideration of a *number* of factors. These included the harm to the defendant, the possible ineffectiveness of curing instructions, and, to some extent, the inherent reliability of the evidence.[11] The majority's aversion to the required weighing of these multiple variables, and its adoption of a simplistic direct accusation test, cannot be squared with the Supreme Court's direction.

## II. THE RELIABILITY FACTOR AND POST–BRUTON DEVELOPMENTS

In the years following the Court's initial decisions under the Confrontation Clause, a good deal of critical commentary emerged. Much of it focused on the growing perception that the Court was constitutionalizing the hearsay rule and its current exceptions.[12] As a result, it was said, efforts to

---

tory evidence and by evidence which significantly links a defendant to a crime.

8. Just as improper jury consideration may result both from inherently accusatory evidence and from substantial linkage testimony, so too can both kinds of evidence produce devastating harm to the defendant. Thus, neither of the two principal considerations elicited by the *Bruton* Court for deciding whether a Confrontation Clause violation is stated—risk and harm—eliminates the *Douglas* Court's inclusion of linkage testimony within the umbrella protections of the Sixth Amendment.

9. Even if Justice Brennan's reference to "powerfully incriminating" testimony were intended to limit the protections of the Confrontation Clause, instead of simply describing one circumstance when the risk of improper jury consideration is high, it would not follow that to be "powerfully incriminating" the evidence would by itself have to directly accuse the defendant. Certainly Justice Brennan's description of the impermissible evidence in *Douglas* suggests that he was aware of the many ways in which evidence may disadvantage a defendant. *See* 380 U.S. at 417, 419, 85 S.Ct. 1074. Linkage testimony, no less than inherently accusatory testimony, may be "powerfully incriminating" in a given case. Other than its arid exegesis of *Bruton*, the majority has adduced no policy, principle, or purpose served by its narrow construction of Justice Brennan's language.

10. That Justice Brennan did not intend to limit the protections of the Confrontation Clause merely to inherently accusatory statements is

underscored by Justice White's dissent. Arguing that the majority's rule would be difficult to apply, Justice White elaborated some of the likely implications of the *Bruton* holding.

> I would suppose that it will be necessary to exclude all extrajudicial confessions unless all portions of them which implicate defendants other than the declarant are effectively deleted. Effective deletion will probably require not only omission of all direct and indirect inculpations of codefendants but also of any statement that could be employed against those defendants once their identity is otherwise established.

391 U.S. at 143, 88 S.Ct. at 1632 (White, J., dissenting). Obviously, Justice White read *Bruton*, as I do, to 'cover linkage testimony.

11. The reliability factor, cited by the majority, Opinion, *supra* at 495 n. 12, was only casually discussed by the *Bruton* Court, see 391 U.S. at 136, 88 S.Ct. 1620, and indeed was criticized as a basis for decisionmaking under the Confrontation Clause. *See id.* at 136 n. 12, 88 S.Ct. 1620. Since *Bruton,* this factor has grown in importance, *see infra* at 505-508. I take account of this factor below, *see infra* at 508, in elaborating the range of considerations relevant to judicial decisions under the Confrontation Clause in the years following *Bruton.*

12. *See, e. g.,* Note, *supra* note 2, at 1434, 1436 (cited with approval in *California v. Green,* 399 U.S. 149, 156 n. 8, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)); *The Supreme Court, 1967 Term, supra* note 6, at 236 (cited with approval in *California v. Green,* 399 U.S. at 156 n. 8, 90 S.Ct. 1930).

"liberalize" the law of evidence would be measurably chilled.[13] In apparent reaction to this criticism, the Supreme Court decided two cases, *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), and *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), which complicate somewhat the multi-factored model which had evolved by 1968.

In *California v. Green,* the Court considered the conviction of John Green for the sale of marijuana to a minor, Melvin Porter. At Green's trial, the prosecution called Porter to testify. Claiming to have been under the influence of LSD at the time of his alleged transaction with Green, Porter stated that he could not recall the underlying facts at issue. Thereupon, the prosecution successfully introduced, for substantive purposes, testimony which Porter had given at a preliminary hearing. The trial court also admitted into evidence statements which Porter had made while in police custody. These statements incriminated Green, and he subsequently was convicted. The California District Court of Appeal reversed, however, and the State Supreme Court affirmed, holding unconstitutional the California statute under which Porter's statements were admitted.

The United States Supreme Court vacated the judgment. Writing for the majority, Justice White held that, while the Confrontation Clause and the hearsay rules "are generally designed to protect similar values," there is not a complete "congruence" between them. 399 U.S. at 155, 90 S.Ct. at 1933. "[M]erely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." *Id.* at 156, 90 S.Ct. at 1934. The "core" of the Confrontation Clause,

Justice White reasoned, is the "literal right to 'confront' the witness at the time of trial . . . ." *Id.* at 157, 90 S.Ct. at 1934. Because Porter was available for cross-examination at trial, and because his preliminary hearing testimony was contemporaneously subject to cross-examination, Justice White found no constitutional infirmity in its introduction against Green. He remanded the case, however, to permit the state court to determine whether the cross-examination of Porter at the trial, during which time the witness flatly denied remembering the events in question, was sufficient to establish the reliability of Porter's statements to the police.

In isolating the opportunity for cross-examination—either at trial or at a preliminary hearing—as an adequate vindication of Confrontation Clause rights, *Green* establishes *reliability* as a prominent factor in the Confrontation Clause analysis. Justice White relied heavily on reliability and on the truth gathering function of confrontation in concluding that meaningful cross-examination at some point is sufficient. *See* 399 U.S. at 158, 90 S.Ct. 1930. He distinguished *Pointer, Douglas* and *Bruton* on the ground that the declarants in those cases were not available for cross-examination. *Id.* at 162–63, 90 S.Ct. 1930. He suggested, moreover, that even if a declarant is unavailable at *trial,* his statement may still be admitted if it was subject to cross-examination at the time it was made. Significantly, however, Justice White did not suggest that external indicia of reliability, in the absence of some opportunity for searching cross-examination, will also satisfy the truth gathering function of the Confrontation Clause in all cases. *Id.* at 161–62, 90 S.Ct. 1930.[14]

In *Dutton v. Evans,* however, the Court took that next step. Defendant Evans had

---

See also Baker, *supra* note 4, at 529–31; Griswold, *supra* note 4, at 717–18. *But see* Note, *Confrontation, Cross-Examination, and the Right to Prepare a Defense,* 56 Geo.L.J. 939, 940–41 (1968).

**13.** Among the commentators urging that the exceptions to the hearsay rule be broadened were: 5 *Wigmore on Evidence* § 1427 (3d ed. 1940); *Proposed Rules of Evidence for the*

*United States District Courts and Magistrates,* rule 8–03 (preliminary draft) (Advisory Committee's Note), in 46 F.R.D. 161, 350 (1969).

**14.** *But see* Western, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv.L.Rev. 567, 599 (1978).

been convicted of murder. At his trial, an accomplice testified against him, but because Georgia law required corroboration of the testimony of alleged accomplices, some nineteen other witnesses were called. One of these witnesses, Shaw, testified that a third culprit, Williams, had told him while they were both in prison that "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." Williams was not called to testify, and his remarks were admitted under a Georgia exception to the hearsay rule permitting the introduction of hearsay statements made during the "concealment" stage of the conspiracy. In a 5–4 decision, the Supreme Court reversed the Fifth Circuit's grant of a writ of habeas corpus, and remanded for consideration of other issues raised in Evans' motion. There was no opinion of the Court.[15]

Writing for a plurality, Justice Stewart reiterated that the Confrontation Clause does not forbid all hearsay evidence. 400 U.S. at 82, 86, 91 S.Ct. 210, 218. Distinguishing *Douglas* and *Bruton*, he observed that *Dutton* did not involve "crucial" or "devastating" evidence. *Id.* at 87, 91 S.Ct. 210, 219. Nor did the case involve "a confession made in the coercive atmosphere of official interrogation . . . ." *Id.* Moreover, there was no joint trial, a context within which cross-examination was said to be particularly important. *Id.* at 86, 87, 91 S.Ct. 210. Furthermore, he added, the hearsay testimony "was of peripheral significance at most . . . ." *Id.* at 87, 90 S.Ct. at 219.

Besides these distinguishing features, Justice Stewart viewed the challenged evidence as having sufficient "indicia of reliability" to obviate the need specifically to confront the declarant. *Id.* at 89, 91 S.Ct. 210. Williams' statement, he noted, was made under circumstances which would not give him a reason to misrepresent Evans' involvement. *Id.* Moreover, Williams plainly knew whether Evans was involved; and the spontaneity of his remark, together with its adverseness to Williams' penal interest, rendered "wholly unreal" the possibility "that cross-examination . . . could conceivably have shown the jury that the statement, though made, might have been unreliable. . . ." *Id.*

For purposes of Belle's Confrontation Clause claim, *Dutton* identifies at least two critically important factors: (1) was the testimony sufficiently reliable to obviate the need for specific confrontation?[16] and (2) was the testimony "crucial" or "devastating"?[17] Of these factors, the first is in some respects novel; while *Green* had held that cross-examination at some point satisfies the reliability concerns of the Sixth Amendment, *Dutton* was the first time since *Pointer* that an unexamined statement was found so intrinsically reliable as to pass constitutional muster. The second factor, however,—the "crucialness" of the statement—had a long history, tracing back at least to the reference in *Douglas* to the "crucial link in the proof" against the defendant.[18] 380 U.S. at 419, 85 S.Ct. 1074. Thus, *Dutton*, to the extent that Justice Stewart spoke for the Court, refined, rather

**15.** Justice Stewart wrote an opinion in which the Chief Justice and Justices White and Blackmun joined. Curiously, Justice Blackmun, with whom the Chief Justice joined, issued a concurring opinion contending that Shaw's testimony was so incredible that no reasonable jury could have credited it. This argument, while equally addressed to the lack of any need for cross-examination by Evans, is at odds with the thrust of the plurality opinion. *See infra* at 507-508. *See also* Note, *The Burger Court and the Confrontation Clause: A Return to the Fair Trial Rule*, 7 J.Mar.J. of Prac. and Proc. 136, 153 (1973). Justice Harlan concurred in the judgment because of his view that the Confrontation Clause does not govern the admissibility of evidence but only the proper procedures at trial.

**16.** *See The Supreme Court, 1970 Term*, 85 Harv.L.Rev. 3, 192 (1971).

**17.** *See* Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 Harv. L.Rev. 1378, 1380 n.11 (1972); *The Supreme Court, 1970 Term, supra* note 16, at 192.

**18.** A number of commentators agree that inquiries under the Confrontation Clause must focus on the importance of the challenged evidence to the prosecution's case, and thus on the harm to the defendant from the lack of cross-examination. *See, e. g.,* Natali, *Green, Dutton, and Chambers: Three Cases in Search of a Theory*, 7 Rut.-Cam.L.J. 43, 63, 74 (1975).

than displaced, prior Supreme Court decisions under the Confrontation Clause.

The inquiry which courts face when hearsay evidence is challenged on confrontation grounds is not straightforward. The decisional law, reflecting as it does the intricacies that inevitably arise in given cases, does not constitute a tidy package susceptible to tight, doctrinal elucidation. Regardless of the majority's desire for a simplistic solution, the task of the lower courts is not to wish away these complexities, but rather to acknowledge them, elaborate them, and apply them as specific facts require. The Supreme Court has set forth the relevant factors: to the extent that the challenged statement directly accuses the defendant, see *Bruton, supra*; supplies substantial linkage evidence, see *Douglas, supra*; is particularly significant in the prosecution's case, see *Douglas, supra; Dutton, supra*; creates a risk that the jury will improperly use it against the defendant, see *Bruton, supra*; was never subject to any cross-examination, see *Green, supra*; was offered in a potentially coercive setting, see *Bruton, supra; Dutton, supra*; and is neither so merely cumulative nor so plainly reliable that cross-examination would be superfluous, see *Dutton, supra,* a Confrontation Clause violation occurs.[19] The majority, perhaps wary of considering so complicated an equation, sidesteps the problem by seizing on a single variable in the calculus. While sympathetic with its plight, I cannot endorse its evasion.

## III. THE APPLICABILITY OF THE CONFRONTATION CLAUSE TO BELLE'S CONTENTIONS

Because the majority is content to focus simply on Munford's failure to accuse Belle

directly in his statement to the police, little if any consideration is paid to the other factors relevant to Belle's confrontation right. When these factors are surveyed, however, there can be no question that Belle has suffered a substantial sixth amendment violation.

First, the challenged statement, though obviously linkage testimony, was certainly "crucial" or "devastating." Munford's claim that he had twice before engaged in narcotics dealings with Roberts was the only evidence that seriously cast doubt on the legitimacy of Roberts' appearance on the scene. It was, in addition, the only plainly inculpating evidence against Belle. To be sure, the prosecution attempted to implicate Roberts by drawing attention to the $1300 found on Roberts' person on the evening of Belle's arrest. But there is evidence in the record suggesting the equally plausible possibility that these funds were simply the proceeds from Roberts' restaurant business. N.T. 73, Second Day. The prosecutor further contended that Belle's guilt is otherwise established by his implausible explanation, after his arrest, for being in Roberts' company. N.T. 144–45, Second Day. But without any admissible, concrete evidence that there was any reason why he should not be, this explanation, such as it was, is hardly substantive proof of Belle's participation in the crime.

Second, the risk was substantial that the jury would improperly use the hearsay evidence against Belle. Munford's statement was testified to by a government agent, a factor which had convinced Justice Brennan that *Bruton* presented an even stronger ex-

---

19. As recently as 1972, the Supreme Court suggested the possibility that linkage testimony may, in a particular case, violate the Confrontation Clause. *See* the decisions in *Schneble v. Florida,* 392 U.S. 298, 88 S.Ct. 2067, 20 L.Ed.2d 1116 (1968), 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). Petitioner in *Schneble* was convicted of murder after a trial in which a statement by his nontestifying codefendant was introduced. The statement located petitioner in the car in which the murder had occurred and in such a position as to make him the likelier of the two defendants to have strangled

the deceased. Despite the fact that this statement did not, in and of itself, accuse the petitioner, the Supreme Court remanded the case in light of *Bruton,* 392 U.S. 298, 88 S.Ct. 2067, 20 L.Ed.2d 1116 (1968). When the case came up to the Court a second time, the majority acknowledged that a *Bruton* error may well have been stated, 405 U.S. at 428, 92 S.Ct. 1056; but it held that any such error was harmless in this instance since the other evidence against the petitioner was "overwhelming," and the challenged evidence was essentially corroborative. *Id.* at 431, 92 S.Ct. 1056.

ample of prejudice than *Douglas*, where the evidence was introduced in the face of a witness' fifth amendment claim. *See* 391 U.S. at 127, 88 S.Ct. 1620. Moreover, the fact that the statement was seemingly against Munford's penal interest, though not providing a strong reason in this instance to find the statement reliable,[20] would nonetheless tend to give it an artificially high salience in the jurors' minds. Finally, the great significance of the evidence in the prosecution's case, noted above, would also increase the risk of its being used against Belle despite the trial court's cautionary instructions.

Third, the Munford statement was never subjected to cross-examination. It was not offered at a preliminary hearing, nor did the declarant testify at trial. Cross-examining agent Hopson would at best reveal that the statement was made. It would reveal nothing about its truth or Munford's motivation for making it.

Fourth, the statement was made in police custody. As noted above, the *Dutton* Court cited the absence of police custody as a basis for distinguishing *Bruton*. The reliability of evidence offered while the declarant is in police custody must inevitably be viewed with some measure of suspicion.[21]

· Finally, the challenged evidence was neither so cumulative nor so reliable that cross-examination would have been superfluous. The Munford statement was vital to the prosecution's case against Belle. It was not cumulative. Neither was its reliability so untarnished that effective cross-examination would have been "wholly unreal." *Dutton, supra*, at 89, 91 S.Ct. 210. That Munford gave his statement in police custody, at a time when he had a distinct interest in cooperating—having been caught so plainly "redhanded"—is surely reason to question his reliability. Moreover, his statement named another individu-

al, O'Neil Roberts, as a joint venturer in his narcotics exploits. The majority apparently agrees that the reliability of a declarant's statement will depend, in part, on whether it reflects an attempt to shift blame to "an accomplice." Opinion, *supra* at 495 n.12. It asserts, however, that "Munford's statements in no way shift blame to Belle or to anyone else, and there is consequently no reason to suspect their reliability." *Id.* This is flatly mistaken. The inculpation of Roberts is self-evident.

The combination of these considerations persuades me that Belle was denied his Confrontation Clause rights. Yet the majority suggests that this conclusion is foreclosed by various circuit court cases which have, in one fashion or another, wrestled with the doctrines announced in *Bruton*. As an initial matter, I note my reluctance to engage in the search for a "case in point" as a substitute for reasoned analysis, particularly in an area where the decisions are, and must be, so inevitably ad hoc.[22] Moreover, virtually none of the cases cited by the majority attempts to account for the wide-ranging concerns which the Supreme Court has articulated in its Confrontation Clause decisions. Nonetheless, the majority also cites no cases that undermine the approach I have endorsed.

Thus, for example, in *United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), a case upon which the majority prominently relies, the court rejected a Confrontation Clause challenge to linkage testimony. It expressly noted, however, that the remaining unchallenged evidence "amply established Wingate's guilt. . . . ." 520 F.2d at 314. Where evidence is plainly cumulative in nature, I agree that a Confrontation Clause violation may not have occurred.

---

20. *See infra* at 509. .

21. *See* Davenport, *supra* note 17, at 1395–96 (arguing that a declaration ostensibly against the declarant's penal interest but uttered under conditions of possible duress should be inadmissible).

22. *Cf.* Davenport, *id.* at 1381 (referring to the "case-by-case factual *redeterminations* of reliability" required by *Green* and *Dutton* ); Note, *supra* note 15, at 161, 166.

The majority also cites *United States ex rel. Nelson v. Follette,* 430 F.2d 1055 (2d Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971). Yet the *Nelson* case is a good deal more complex than the majority acknowledges. The Second Circuit in *Nelson* considered Confrontation Clause challenges to two different statements. In rejecting Nelson's objection to the codefendant's first statement, the court noted that there was extrinsic evidence which would render less likely a jury's inference that the person referred to in the codefendant's statement was in fact defendant Nelson. 430 F.2d at 1057. The court seemed to recognize, if implicitly, that codefendant testimony which is *strongly* linked by other testimony to the defendant can violate the Confrontation Clause. As to the codefendant's second statement, the court again noted that there was ambiguous evidence on the record which would require the jury to make "a substantial inference [in order] to implicate Nelson in the crime . . . .." *Id.* at 1058. There are no such ambiguities in Belle's case. Next, the *Nelson* court reached what I regard as the heart of the matter. Noting that the "circumstances to which the rule of *Bruton* was directed" are those in which " 'the risk that the jury will not, or cannot, follow instructions is . . . great,' " *id.* (quoting 391 U.S. at 135, 88 S.Ct. 1620 at 1627), the court

elicited two reasons why those circumstances were not presented. First, there was so much other evidence against the defendant in *Nelson* that the codefendant testimony could not be deemed a *vital* part of the prosecution's case. *Id.* at 1059. Second, the codefendant's testimony in *Nelson* was extraordinarily self-serving and exculpatory. *Id.* at 1059. These two factors convinced the court that there was little risk that the jury would use the codefendant testimony against defendant Nelson. Both factors square neatly with the analysis I have suggested.

Finally, the majority cites the Ninth Circuit's decision in *United States v. Mulligan,* 488 F.2d 732 (9th Cir. 1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974). It is true that the *Mulligan* court required that a challenged statement "directly implicate a co-defendant" before a *Bruton* violation will be recognized. 488 F.2d at 737. But, in so ruling, the court properly focused on the danger that the jury would improperly use codefendant evidence against the defendant. *Id.* Given the already extensive evidence against the defendant apart from the codefendants' hearsay remarks, *see, e. g., id.* at 734–35, 736–37, it is hardly surprising that the court rejected defendant's Confrontation Clause contention.[23]

**23.** The majority marshals four Third Circuit cases in support of its restrictive reading of the Confrontation Clause. None of them does the slightest damage to the analysis I have suggested. In *United States v. Panepinto,* 430 F.2d 613 (3d Cir.), *cert. denied,* 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970), appellant Baglino, despite offering a *Bruton* contention, did not contest the fact that there was ample evidence to support his guilty verdict. 430 F.2d at 615 n. 1. Indeed, substantial eyewitness testimony placed him at the scene of the crime at approximately the precise time. *Id.* at 615. Similarly, in *United States v. DiGilio,* 538 F.2d 972 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), the court expressly found that the *Bruton* violations, though unmistakable, were harmless in light of the remainder of the evidence. 538 F.2d at 982–83. In *United States v. Lipowitz,* 407 F.2d 597 (3d Cir.), *cert. denied,* 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969), the court noted that the codefendant "did not mention [the defendant]

by name *or say anything which would implicate him in the robbery.*" 407 F.2d at 600 (emphasis supplied). Plainly, the court implied that confrontation concerns are triggered by remarks that fall short of actually *naming* the defendant. To be sure, the court observed that "[h]ad [the defendant] been named in [the codefendant's] statements . . ., the principles enunciated in [*Bruton*] might be applicable." *Id.* at 602. But that merely states the most obvious case for Confrontation Clause protection. It does not rule out cases, like Belle's, where the evidence is a vital link in an inculpatory chain. Finally, *United States v. Alvarez,* 519 F.2d 1052 (3d Cir.), *cert. denied,* 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975), is also distinguishable, in that the court expressly found the evidence apart from the challenged statement to be "overwhelming." 519 F.2d at 1055. *Alvarez* thus depends on *Harrington v. California, supra,* and *Chapman v. California, supra.*

I find more compelling the mode of analysis used by Judge Winter in *United States v. Leonard*, 161 U.S.App.D.C. 36, 494 F.2d 955 (1974). There, appellants objected to the introduction of two hearsay statements of a codefendant, the first of which constituted linkage testimony, 161 U.S.App.D.C. at 49, 494 F.2d at 968 n.19, and the second of which directly implicated the appellants, *id.* In rejecting appellants' Confrontation Clause contentions, Judge Winter considered the multiple factors emerging from the Supreme Court cases, *id.* at 969–70, 161 U.S.App.D.C. at 50–51. Ultimately, he was persuaded that the challenged statements lacked sufficient reliability, as well as importance in the government's proof, to constitute a constitutional violation. *Id.* at 970, 161 U.S.App.D.C. at 51. Nonetheless, he acknowledged that both statements—including the linkage evidence—"would raise a serious Confrontation Clause issue" were the distinguishing factors not present. *Id.*[24]

## IV. CONCLUSION

This is a case in which the prosecution's evidence against one particular defendant was wholly circumstantial in nature. More critically, the only solid evidence on one link in that circumstantial chain consisted of an extrajudicial statement by a codefendant. Not only is there "a reasonable possibility that the . . . evidence contributed to the conviction," *Schneble v. Florida, supra,* 405 U.S. at 432, 92 S.Ct. at 1060, but there is, in my judgment, *no* possibility that it did not. Such an error, and error it surely was, can thus in no sense be deemed harmless. The majority does not otherwise contend. Instead, it eludes the difficulties of the case at the constitutional threshold.[25] It extracts a single phrase—"powerfully incriminating"—and expects that to do the work of many years of Supreme Court case law. Its holding, confining the Confrontation Clause to direct accusations and placing circumstantial evidence outside the ambit of the Clause, cannot be reconciled with that case law. A harmless error analysis, while unjustified on this record, would, since it would have fewer future consequences, be less offensive. Instead, the majority has chosen to give the Confrontation Clause the

---

**24.** See also 161 U.S.App.D.C. at 66, 494 F.2d at 985 (Bazelon, C. J., concurring in part and dissenting in part) ("[T]he Confrontation Clause compels exclusion of extra-judicial statements that contribute in any substantial way to the prosecution's case unless the Government can affirmatively demonstrate that the declarant is unavailable and, hence, cannot be produced for cross-examination at trial; and the required strength of this showing should depend, in turn, on the extent to which the circumstances and content of the statements indicate their reliability." Thus, if particular extrajudicial evidence is "crucial" to the prosecution's case, the trial of the codefendant declarant must be severed from that of the defendant and the declarant must be granted use immunity and required to testify. Even then, his extrajudicial statements may only be admitted for impeachment purposes); *United States v. Holleman*, 575 F.2d 139, 145–46 (Fairchild, C. J., dissenting in the relevant appeals) (arguing that the substantial linkage testimony in the case violated appellants' confrontation rights).

**25.** In an effort to defend its narrow construction of the Confrontation Clause on policy grounds, the majority argues that a broader rule covering linkage testimony would require the Government "to expose its entire case on a motion for severance." Opinion, *supra* at

496. This, the majority asserts, would result in "the practical prohibition of joint trials." *Id.* I do not believe that applying *Bruton* to circumstantial evidence, as well as to direct accusations, entails such draconian consequences. At most, a broader rule would require trial courts to survey the codefendant statements which the government plans to introduce and order the production of those statements which are arguably substantial enough to supply meaningful linkage evidence. Trial judges are thoroughly familiar with such tasks, experienced as they are in the intricacies of complex discovery proceedings in modern litigation. I do not expect them to have any less facility with the responsibility that *Bruton* requires them to discharge. More critically, even if a less crabbed reading of *Bruton* does require fewer joint trials, this, at most, will produce some loss in the efficiency of the adjudicatory process. *See* Note, *Joint and Single Trials Under Rules 8 and 14 of the Federal Rules of Criminal Procedure*, 74 Yale L.J. 553, 553 & n. 2 (1965). That small cost, however, will vindicate confrontation rights which Justice Black in *Pointer* termed "fundamental." 380 U.S. at 404, 85 S.Ct. 1074. The majority has sacrificed those fundamental rights on the altar of efficiency. The Constitution warrants better treatment.

narrowest possible reading it could devise, and thus to maximize the government's opportunity for exposing defendants to the risk that juries will use devastating hearsay against them. I would grant a new trial.